Good morning. The first case this morning is 071357 for Global Technologies v. ITC. Mr. Angellieri, first. May it please the court, Frank Angellieri for Global Technologies. We're appealing one issue in response to appealing many other issues. We go first merely because our appeal became right first. That's how the briefing went in and that's how we ended up agreeing to the argument over there. Our issue is public use and in our view the ITC errs in the matter of law in its public use polling because the findings found by the ITC don't meet either the accessible to the public or the commercial exploitation prongs of public use. To be a public use, to qualify as public use… The Baxter case, there were fewer people I agree, Your Honor, but there was essentially no control placed by the inventors. Here we had significant restrictions and limitations on secrecy and we have essentially an undisputed record that those limitations… Secrecy? Yes. And there were no confidentiality agreements. That's true, but we employed many other restrictions on disclosure of the patented designs… That didn't let people take pictures or something like that, but nevertheless all these people observed the design. That's true, Your Honor. Enjoyed all of its ornamental features. I didn't hear the word… Enjoyed all of its ornamental features. I mean the design was on display, right? The fiberglass mock-up vehicle was on display. And your argument at the very bottom is that the display, which was here to the public, can't be an invalidating public use unless it's enabled. Isn't that what you're saying? You're saying that the public has to be able to make and use the invention. No, I don't go that far. Why aren't you going that far? You're saying they couldn't reproduce it. That's the very words in your brief. Yes. Reproducing an invention is done when you are enabled to use it. And we've held way back in 92, I think it was, or 94 in the Epstein case, that the disclosure doesn't have to be enabling to be an invalidating public use. It doesn't have to be enabling. But the difference is, Your Honor, we employed significant restrictions on… So what? It was still public. I don't think it was public. It was invite-only. No one could come and go. That's a significant distinction. Invite-only doesn't make something non-public, does it? I think it's a significant factor. I think that, and Bernhardt is a great case for talking about whether or not you need a confidentiality agreement. If you needed a confidentiality agreement, then we'd be done. But the law is clear, you don't need a confidentiality agreement. If you look at Moleculon, there's no confidentiality agreement. If you look at Bernhardt, there's no confidentiality agreement. It comes down, TP Labs had no confidentiality agreement. This Court's jurisprudence is that when there is no confidentiality… But you had the confidential relationship you pointed out in TP Labs, the patient-doc-dentist relationship in that case. Is there anything of that nature here? No, there isn't. And I don't think you need a confidential relationship. There are different reasons that one might not need a formal confidentiality agreement. Is there anything that would have prevented someone from leaving the showroom and saying, oh, they've got square lights with three little vertical things in the corner? Is there anything? Yes. I think that, first, legally, no. Practically, yes. And also… Using honeycomb instead of egg crate shapes for some of their designs. If… What would anything prevent that? Not legally, no. But I think that… What practically? Pardon me? What practically? I mean, these people who were free to go home and tell their friends and their wives and their neighbors what they had seen. As Judge Rader was pointing out, they'd say, oh, I saw egg crate or I saw this or I saw that. What practical limitation? That's not even close to disclosing the entire design. You said in response to Judge Rader that there was no legal restriction on any of these people conveying to whomever they wished the essence of what they saw. I think… But you said there was some practical limitation, like they can't speak or their tongue is tied. No, no. The practical limitation is they can't communicate the designs. And when we employ restrictions… They can't say what? Pardon? They can't… Communicate the designs. Who said they couldn't communicate the designs? They said they couldn't. Their answers… There is no substantial evidence that they could communicate any of the patented designs. There's none on the record. They weren't able… They were unenabled, right? I don't… They were unenabled, but it's not an enabling concept. I think it relates to the effectiveness of the secrecy measures that we employ. The law is clear that we don't have to have an absolute confidentiality agreement. It's also clear that public use is a use without any limitations or restrictions. Here we have limitations and restrictions that fall short of a formal, legal confidentiality agreement. The fact that they couldn't communicate these designs goes… What are those limitations? They're on pages 20 and 21 of our brief. There's security guards at the door. There's invite only. There's a security guard at the door. That's to keep people from coming in, right? Yes. Just to make certain that the people who got invited came in. Correct. Because they wanted to make certain that the control group that was looking at this stuff was as they requested. It was a segment of the public that was hand-picked by your client. Hand-picked, yes. All the guards are doing is making certain that somebody whose view of the design, and that for that was irrelevant, didn't get in. For example, to exclude the President. Besides the armed guards who were there to police the attendance list, what other factor do you say precludes finding a public use? The most significant restriction that we employed was the no cameras, no sketches, no drawings. That restriction, coupled with the exclusion of auto industry insiders and folks who might conceivably take these designs out, effectively prevented… They were the functional equivalent of a confidentiality agreement. I don't say that anyone's to test, but when you employ restrictions and there's no question that they worked, it's the functional equivalent of a confidentiality agreement. All right. Let's hear from Mr. Berry. May it please the Court. Good morning, Your Honors. I'm Alan Berry, with the Respondents in the proceeding below. I just want to introduce Heather Boyce and Brian Arnold, my colleagues. Your Honors, from the standpoint of the Respondents in the proceeding below, this appeal is all about the use and event. The use and event was clearly a commercial launch of the F-150 truck designs. What's hard to understand here is how you have an event when you have two full-size F-150 truck prototypes. You have nearly 1,000 people looking at those prototypes. You have smaller groups. By the way, prices were given on those prototypes, MSRP, financing. Everything you wanted to know about buying one of those prototypes was there on the floor. And then you have the inventors who were caught on videotape witnessing attendees describe how they explained those designs and described those designs to others outside the use and event. In fact, you had Mr. Metros, another inventor, admit that, yes, he's witnessed people who were telling him. Is there any evidence anywhere that any of the complete designs, if possible, were displayed or conveyed outside of the confidential room? The evidence that we have, Your Honor, is that these Respondents or these participants were not asked to replicate the designs. Is there any evidence in the record that there was any conveyance of any aspect, let alone the whole design, which, of course, is what has to be conveyed outside of the confidential room? No, there's not, Your Honor, nor for commercial. Then why is it public? Because it's a commercial exploitation. What we have here is Ford attempting to shoehorn this case into a public accessibility type of public use. In Vitrogen, this Court's opinion in Vitrogen says we have two species. One is public accessibility, and the other one is commercial exploitation. We know that the Kitson-Bow line of cases does not care whether it was secret or not whether there's overwhelming evidence of commercial exploitation, and that's what we have here. Insofar as the notion that these attendees had to go out and reproduce the designs, that's not correct. In Ray Mann said the only way you can make use of a design is to exhibit it, display it, experience it, and observe it, and that's what happened at the Houston event. So we do not agree with the contention that these people had to leave the Houston event and somehow replicate the designs, albeit it's correct they were there. Would it be possible to do that, do you think? That's speculating as to what these people did. Do you think just taking one, the headlight, the front headlight, would it be possible for someone to look at that, passing by, getting an impression to go outside and replicate it? They were, of course, forbidden to do so. But from the evidence that was provided, I think the answer to that is yes. These were full-size vehicles, Your Honor, that you could walk around and observe. But think a little bit about what you just told me. You're telling me that someone from memory could replicate a multitude of different shapes, the arrays, the small light, larger light, three stripes in the corner of the marker lamp, which is kind of an offset trapezoid. You're serious that you think that could be done by somebody? I think the impressions were important. No, no, no, no, we're not talking about impressions here. We're talking about the, remember, it's the detail that counts. We hold in ornamental designs, we hold an infringer to every aspect of the complete detail. And so that's what they'd have to replicate. And I understand it may be difficult, Your Honor, but if you consider the fact… Difficult? That's even an overstatement, isn't it? I don't understand the relevance of that. It would be a feat beyond the ordinary by a great, great step, wouldn't it? It may, Your Honor, but I do not understand the relevance of the need for these people to have reproduced outside the Houston event what they saw in detail. Because the subject matter of that event entered the public domain one year later. And that's the point. It was taken out of the public domain by the fact that Ford didn't file any design patents here from two to three years after the event. This was highly material subject matter. No question about it. The Commission found that. Three patents were held invalid in light of the Houston event. The Houston event prior arc was the subject matter of the obviousness analysis, the anticipation analysis, and why? In light of the Egyptian goddess, the obviousness determination should be sent back? Infringement, yes, we do. The point, though, on the materiality... Oh, that's correct. We didn't have Egyptian goddess work off of that. That's correct, Your Honor. Resolving infringement? Resolving infringement and the net block... But they didn't rely on a point of knowledge, did they? I mean, in effect, they applied to the Egyptian goddess, didn't they? Egyptian goddess was not applied, Your Honor. Of course, they didn't have it. But the point of Egyptian goddess is you don't rely on the point of novelty test, and that's exactly... They used the ordinary observable test. But we didn't use the Egyptian goddess ordinary observable. We did not use the Egyptian goddess ordinary observable. There was no such thing as an Egyptian goddess ordinary observable. But that goes back to Gorham, the Supreme Court, years before. And you certainly had that, and you applied that. That's all the Egyptian goddess required you to do. But Egyptian goddess requires the ordinary observable to be cognizant of the prior argument. That was not the ordinary observable. And you don't think Gorham required that? I don't think Gorham required it because that was the purpose. I understood the point of novelty being added to begin with. But the bottom line is there was no ordinary observer who was cognizant of the prior art that assessed these patents for infringement purposes. Your Honors, I want to touch on one point here before my time is up, and that is to say that we are deeply troubled about no finding of inequitable conduct. I know you hear this defense many times before. But where the commission found the Houston event was prior art based on inventors, having witnessed people describe what they told others outside of the event, part on videotape doing that, admitting that, and not putting those things together. We've had a pretty significant debate here about whether the confidentiality was sufficient to make this something other than public. With that kind of a question hanging in the balance even here at the final stages, how would you attribute intent to what they did? I would attribute intent, Your Honor, because the commission did not move on to consider should have known. Should they have known when they are schooled? No, no, no, you're missing kind of the point. The point is it's a close call whether this is a public use at all. They didn't disclose it, but don't they have a pretty good reason not to disclose it? They thought they were being confidential. They had sealed the doors, they didn't allow pictures, and they were relatively confident that nobody with photographic memory would leave and replicate the designs. But the materiality here is based on the fact that this was commercial exploitation. They were, the court, the commission relied on the subjective intent of these inventors to find no intent to deceive. In fact, simply ended the analysis at actual knowledge. Never even considered should they have reported this to the patent attorney because they were schooled on what it took to be public use. They were schooled on what would happen if they did not report material information to the patent office. So why the commission did not engage in a should have known analysis to infer intent we believe was not only an abuse of discretion but doesn't support the lack of intent finding. Thank you, Your Honor. Good morning. May I please record Jonathan Engler for the International Trade Commission. I'd like to begin briefly with a discussion of the seduction goddess question that you raised. In this case, in the anticipation analysis that the ALJ undertook, he looked at the patented designs with the eye of an ordinary observer, conversing with the prior art. If you look at the record, there's a fairly extensive discussion of the various prior art references that Keystone raised. So whether or not the Egyptian goddess changes anticipation analysis, the ALJ properly took into account all the prior art references and did the Egyptian goddess analysis without calling such a course of name. However, just to describe, the ALJ did what he needed to do on anticipation. One thing, however, that... On the infringement side of the coin, am I wrong? I was under the impression that there really wasn't any contest over whether or not the ALJ copied it. Well, in our view, there is no question that infringement, or Keystone has raised this question whether the ALJ analysis was passed. It has to be copying, doesn't it? It has to be an exact copy for the aftermarket part to be bought as a replacement. Precisely going to replace your honeycomb gresh with an egg carton gresh, or mesh grill, or whatever, ruins your 150. Well, this is the entire purpose of this. The entire purpose, okay. And also, it's consistent with this court's jurisprudence on the question. In L.A. Deere, the court found that copying, or copying submitted to substantial similarities is not disputed, and there is infringement. So we really don't see how there can be an issue on infringement. I turn these to the public. I beg your pardon? What is the notion that Egyptian goddess somehow bites on this appeal? I beg your pardon? Egyptian goddess is irrelevant, isn't it, to this appeal? I agree. I can't see the relevance of Egyptian goddess in the infringement analysis. Egyptian goddess is an infringement case, right? Correct. The close call is probably obviousness, isn't it? There are minor differences, so you can escape the anticipation counts. Why isn't there an obviousness concern here? Well, as a preliminary matter, the keystone provided no testimonial evidence about the overall visual impressions of the claim designs, as a whole, compared to the prior argument. So the factual predicate, before we start getting into the question of the individual prior argument references, there's simply no evidence on the record. Mr. O'Loughlin went into quite a bit of detail through the evidentiary gaps here, and testimony of the keystone's witness was simply not on point. The burden was on keystone, of course. This is Mr. Skolski, right? That's correct. Given that keystone is alleging invalidity, they had the burden to provide very convincing evidence. Are there also strong secondary considerations to help him? Well, there are strong, of course, secondary considerations to help this, in the sense that there's the commercial success, of course, of the floor parts. Yes, but I'm hoping you're going to throw copying out here. Well, the fact is that copying... Now I want to ask you the question, though. Given what we just discussed, which is that, of necessity, this market requires copying. You can't have an egg crate mesh on one side and a honeycomb mesh on the other side. So you have to copy to meet the market. Does that vitiate at all the strength of the copying secondary consideration? Because they're no longer copying because it's a marvelous invented feature. They're copying because that's what the market requires. So it really isn't a secondary consideration, is it? Well, it's, in a sense, a primary consideration. I'm saying there's no nexus because copying in this instance does not indicate the value of the invention it's required by the market. Well, precisely. Then it's not a secondary consideration. And this could do without the secondary consideration. Well, so I lured you into saying copying. I'll let you off the hook. I beg your pardon? I lured you into saying copying is a secondary consideration, but I think it's somewhat undercut by the facts of this case. Well, I wouldn't say it's so much that it's undercut, but the obvious analysis in a case involving copying that the two somewhat merge because you're not in the deep. The question isn't whether there's really no dispute that when you're comparing the Q's design to the patented design that the analysis of whether there's an obvious one of ordinary skill in the art to make that duplication is really not a helpful inquiry that's supplemented in any way by the secondary considerations. It's one of the funny spots that we find ourselves in because of the limited copying that I think sometimes gets a little bit lost in some of the briefing. It's fundamental to this case. If I may for a moment, unless you have further questions, I'd like to turn to a couple of issues on this public use question. We've spent so much time on it. Fundamentally, the point that Ford is missing, that the purposes of the public use analysis, the 1,000 members of the public who were invited to this marketing event had no obligation of secrecy to Ford and were free to leave this event and talk to whoever they wanted to about it. Those 1,000 people were the public for the purposes of the public use analysis. As this court said back in Egbert-Ulitman, that even one person can constitute the public if their relationship between the inventor of the patentee and that person is one in which there's no obligation of confidentiality. Here we have a case where 1,000 people had no obligation of confidentiality. Did they have no obligation of confidentiality? They were stopped from taking pictures. They were monitored to some degree. Well, the question that this court has raised is whether in previous cases, first of all, one has to take into account the fact of circumstances and totality, not isolated issues like confidentiality, but the absence of one. But rather, none of those issues, the security not being permitted to bring in cameras, created any obligation between the attendee and the court. In fact, it's relevant that the attendees did not even know that this was Ford's event. It was handled by a third party, which the Moreface, I think, was the name of the conference organizers, which further argues against the notion that these parties could have had any obligation of confidentiality to Ford, who had no idea he was involved with this. He says that even more important than public use is the fact that this was a commercial exploitation. Well, that was the next point I wanted to touch on. And this isn't experimental use or anything like that. It's a business marketing. Exactly. And this court has held before with design patents that the experimental use doctrine doesn't apply because they aren't. Design patents have no scopes as soon as they are finalized, and that's the design. There's no way to experiment with them without changing the design completely. And this court has held in Ray Smith that market testing after design was finalized, and that was a case in which the question was, would customers be interested in buying this finalized product, and how much would they pay, and would it be a fair price? These were precisely the issues that Ford wanted to address at this marketing event. It's the nature of marketing events. So this is... Well, I didn't have all the money to put this show on if there was some benefit to it. Well... It was like a free art show. And there's extensive testimony about the expense and the trouble that's necessary to go through to put on such an event and to create these models. So the notion that it was done for purely... Well, where do you stand with regard to Mr. Anglieri's key argument? He says there can't be a public use where the party who... a member of the public who saw the design is incapable of replicating the design. There's nothing in the law, the case law, on public use that has ever suggested that it's necessary for the viewing public to be able to reduce the practice of what they saw in order for there to be a public use. First of all, because there's this fact that 1,000 people were the public until the first public use. And that's been case after case, beginning with Egbert. That is, the public has been undisputably... Has been... Sorry. The public has constituted the person who views... The key to that, though, and the key to Egbert, is that the young lady who got the advantage of the corset and later became the inventor's wife, she did get a benefit, see? But the key to that was she had the full enjoyment of that invention without restriction. These people did not have the full enjoyment of the invention without restriction. They didn't get to drive away the Ford 150s and display them to their friends and get the full benefit of the designs. They merely observed them under restricted circumstances and then left. Why isn't that very different from Egbert? Because... It's very similar to Egbert because the full enjoyment of a design is its viewing. And these people were able to view and to do what else you would... The question isn't a whole vehicle. They didn't... There's no patent on the entire vehicle. So whether they could drive it off a lot and go to a tailgate party isn't really relevant to the question of whether they had the full enjoyment of the fender in the course of the... So your point is that some... Two people, for example, at the show who observed the rear... The side gear on the headlamp could say to one another, gee, isn't that a great design on the headlamp? And that is the nature of the full enjoyment of the design. Okay. Thank you. Thank you. I'll try to respond to the points that came up regarding obviousness of the other issues. For all but one of the patents, not found invalid and reduced in the clinic, the respondents did not even present evidence on all the views of the patent. I think there's no substantial evidence... Or there is substantial evidence to support a finding if they didn't have even a primary reference that you need for obviousness under board. By the way, just an observation. My clerks and I had a horrible time just trying to see the blurry images you gave us in the record. Can't you do a little better job of showing us what we're looking at? My apologies, Your Honor. That doesn't apply just to you. That's all the parties, of course. Please proceed. They also... For most of these, there's no secondary reference. There's no... Assuming KSR applies, there's no reason to make... There's no evidence about reasons to make changes or reasons to modify the primary reference. With respect to the copying, Your Honor, whether it's a secondary consideration or not, two points. One, there is an entire industry of people who compete in the aftermarket without copying. There was a motion for summary determination on functionality in this case. We moved... They have a functionality defense. We moved to take it out. And one of the reasons we prevailed and it's not been appealed is that for each of these parts, there are, in fact, alternative designs available. So I think copying does... It is a true secondary consideration. I think the copying is also relevant. What did you say about functionality? They had a functionality defense. We moved for summary determination to get the defense out of the case. We prevailed. That has not been appealed. The reason we prevailed... Yes, Your Honor. The reason we prevailed is that there is an industry of aftermarket. There's a big show called SEMA where these parts are displayed and they're not copies. All of the parts at issue have non-copy parts that are available in the marketplace. The design of our grill is not functional because there are other designs that are available that meet the same functional purposes. The design is ornamental, not functional. For example, the grill. There are many different grills that can be used with the M150. So our design... I think copying is also relevant because it puts a character on the differences. The differences that respondents are describing is trivial. For example, between the Houston Clinic and the commercial parts that they copied. Well, they're not trivial to them in the real world because they didn't go and copy the Houston Clinic design. They copied the commercial design. So that is real-world evidence that directly rebutts their position that, well, gee, nobody can really tell the difference between all these parts. They're all the same. With respect to infringement and Egyptian goddess,  because there is copying. Egyptian goddess goes to framing the significance of differences between the patented and the accused, and there are no differences. With respect to inequitable conduct, there's substantial evidence to support the findings of known intent and credibility. And finally, with respect to the commercial exploitation side of public use, we briefed it and we stand by our briefs, but I think that the important point is that comes up in two different ways in two different contexts. When you're talking about rebutting experimental use contention, which we don't make, it's a low standard. But when you're talking about relying solely on commercial exploitation, the Supreme Court and this Court require use to make a commercial product, and we don't have that here. Thank you. Thank you, Your Honors. Going backwards, this is a commercial exploitation case, just the way it was in the case of Goddard. This Court did not address the secrecy issue, but flatly said that Deere was exploiting its agricultural equipment, and it didn't matter what the secret format was. On the all views issue, I'm deeply troubled by it because the evidence is clear, appendix page 79, that there were very minor, if any, changes made from the F-150 prototypes from the Houston clinic to the eventual commercial embodiment. And more importantly, the reason that all views weren't available, the prototypes themselves were destroyed. They weren't available to the Commission. And also, bear in mind, that Ford conceded that three of its patents would be invalid if the Houston clinic were proven to be of our heart. And, of course, those three patents show multiple views, multiple views which we may not necessarily see from the prototypes at the Houston event. And just touching on commercial success, we agree there is no nexus. The testimony had to do with the sale of the overall vehicle. Ford witnessed and explained that there were all kinds of reasons why there may have been commercial success, none of which we could find in this record attributable to the patent designs. Do you have any further questions around that? Thank you very much. Thank you. Thank you.